SIERRA CLUB et al., Plaintiffs-Appellees,

v.

Howard H. CALLAWAY, Secretary of the Army, et al., Defendants-Appellants,

Trinity River Authority of Texas et al., Intervenors-Appellants.

No. 73-2745.

United States Court of Appeals, Fifth Circuit.

Aug. 26, 1974.

Rehearing and Suggestion of Rehearing En Banc Denied Nov. 22, 1974.

James H. Keahey, Martin Harris, Frank R. Booth, Austin, Tex., for Trinity River and others.

S. G. Johndroe, Jr., City Atty., Ft. Worth, Tex., for City of Ft. Worth.

Joseph G. Rollins, Senior Asst. City Atty., Houston, Tex., for City of Houston and others.

Peter R. Steenland, Wallace H. Johnson, Edmund B. Clark, Raymond N. Zagone, George R. Hyde, Dept. of Justice, Washington, D. C. and Anthony J. P. Farris, U. S. Atty., Charles B. Wolfe, Asst. U. S. Atty., Jack Shepherd, Chief Asst. U. S. Atty., Houston, Tex., for Secretary of Army and others.

Warren Clark, Jr., Anahuac, Tex., for Chambers-Liberty Counties Navigation Dist.

N. Alex Bickley, City Atty., Carroll R. Graham, Peter R. Thompson, Dallas, Tex., for City of Dallas.

Robert H. Singleton, Houston, Tex., John D. Hoffman, San Francisco, Cal., Ray Berry, Houston, Tex., for plaintiffs-appellees.

Before WISDOM and CLARK, Circuit Judges, and GROOMS, District Judge.

GROOMS, District Judge:

This is an appeal from a Summary Judgment permanently enjoining Howard H. Callaway, Secretary of the Army,[1] Lieut. General Frederick J. Clarke, Chief of Engineers of the Corps of Engineers of the United States Army, and Col. Nolan C. Rhodes, District Engineer of the Corps of Engineers (hereinafter referred to as the Corps), from constructing the Trinity River Project and from continuing with the construction of the Wallisville Project in the State of Texas pending further orders of the court. Intervenors, Trinity River Authority of Texas (Trinity), Coastal Industrial Water Authority of Texas (Coastal), and the Cities of Houston, Dallas and Fort Worth, also appeal. The case was brought as a class action by Sierra Club, Environmental Protection Fund, and others (hereinafter called Sierra Club), for themselves and others similarly situated. The complaint was grounded upon an alleged failure of compliance by the Corps with the National Environmental Policy Act of 1969. 42 U.S.C. § 4331 et seq.

Trinity is a Texas conservation and reclamation agency with the duty of planning for the development and utilization of the soil and water resources of the Trinity River watershed with power to engage in water supply, flood and pollution control, sewage transportation and treatment, navigation, soil conservation, and other related activities. Coastal is also a Texas conservation and reclamation agency with authority to sell, transport and deliver water to customers. Houston is concerned with the transportation and distribution of water much of which presently comes from the Trinity River. It has contracted with the federal government for the use of the reservoir being created by the Wallisville Project as a transfer point for a part of its water supply. Dallas and Fort Worth are located on the upper reaches of the Trinity River Basin and are interested in the flood control and navigational aspects of the Trinity Project.

The court in what clearly was a monumental task has written ably, at great length, and with much detail, 359 F. Supp. 1289, pp. 1298–1386, and awarded the relief prayed for.

The Corps insists that the court erred (1) in considering the Wallisville Project as a mere increment of the Trinity River Project; (2) in examining and ordering revision of the Corps' benefit-cost ratio; (3) in applying an inappropriate burden of proof requirement; and (4) in improperly enjoining the two projects after making an erroneous determination that the Wallisville Environmental Impact Statement (EIS) was inadequate.

Trinity, Coastal and the three cities in the main join the Corps in its insistence upon the errors referred to. They further insist that the court erred in grant-

1. Since the institution of the action defendant Callaway succeeded defendant Robert F. Froehlke as Secretary of the Army and was substituted for him.

ing the Motion for Summary Judgment because the record shows material fact issues which require a trial on the merits. The Corps asserts that Summary Judgment was the proper procedural vehicle, but that judgment should have been for it on its Motion for Summary Judgment.

The Chambers-Liberty Counties Navigation District, a party to the construction contract with the Corps, with wide interest in navigation and related activities in the Trinity and Galveston bay areas, files a brief *amicus curiae*. In addition to the question of whether Wallisville was, and is, a component of the Trinity Project, it also presents the question of whether the Corps, when involved in an ongoing project, may approach the required compliance with NEPA differently from what might be required with respect to new projects.

We reverse and remand.

The Trinity River Project is extensive in scope. It includes the elimination of 184 crooks and bends in the river and the construction of a channel of a width of 200 feet and a depth of 12 feet extending from the Houston Ship Channel in Galveston Bay to Fort Worth, a distance of 363 miles. It will require sixteen dams and twenty locks with a total lift of 496 feet. Future plans include a channel of 250 feet and the addition of duplicate locks. The latest projected estimate of costs of the Project is $1,356,000,000.00.

The Wallisville Project is located at the mouth of the Trinity River and consists of a low dam 39,000 feet in length, with a navigation lock of a size conformable to those upstream. The project entails enlarging an existing 6-foot-deep by 100-foot-wide navigation channel from the reservoir to Liberty, Texas, a distance of twelve miles. The reservoir will have an initial operating level of four feet and will cover approximately 19,700 acres, with structural facilities occupying 80 additional acres. The total estimated costs of the Wallisville Project is $28,800,000. As of December 31, 1972, the dam and lock was approximately 87% complete and the overall project 72% complete.

The court below has set out *in extenso* with copious references the legislative history of the Trinity River and Wallisville Projects. To here recount it other than in general outline would serve no useful purpose.

The navigation of the Trinity River first received federal recognition and assistance about the time of the Civil War. In 1902 the River became a major federal project. A four-foot channel with 37 locks and dams for water utilization and navigation was projected. From that date until 1916 Congress authorized the individual construction of various locks and dams. But in 1922 it abandoned the project except for the channel from the mouth of the River to Liberty, Texas. In 1930 the channel to Liberty was suspended. However, in 1940 it was reopened with a limited allocation of funds.

In 1941 the Corps published the first major study of the Trinity Basin. The plan proposed for flood control, navigation and water conservation contemplated a channel 9 feet deep and 150 feet wide, with 26 locks and sufficient dams and reservoirs for water storage necessary for navigation. Because the navigation feature was found to be economically unjustified, the Corps recommended the approval of the plan as a whole with postponement of construction above Liberty. In 1956 a major drought caused extensive saltwater intrusion with much damage to rice crops. As a result local interests constructed a temporary dam in the River as a saltwater barrier. Following that and later intrusions the Senate Committee on Public Works adopted a restudy resolution in 1958, following which the Corps recommended a comprehensive study of the entire River Basin with a view toward development over the following 40 or 50 years.

Following the completion of a restudy of the Trinity Project in 1963, the Corps recommended that redevelopment plans

be coordinated with the Wallisville Project. In 1965 Congress conditionally approved the Trinity Project and appropriated $83,000,000.00 for its partial accomplishment, but directed that before any expenditures be made for the navigation features that the Corps submit a reevaluation based upon current criteria.[2] In 1968 the Corps submitted its reevaluation study with respect to the economics of the navigational features. The Corps reported that those features were "well justified."

Under the 1958 restudy resolution the Corps authorized an interim report on the immediate problem of saltwater intrusion. In 1961 it submitted its interim report to Congress and recommended that a saltwater barrier reservoir be constructed near the mouth of the Trinity River. In 1962 Congress approved the Corps' recommendation for the Wallisville Lake and Dam,[3] with the purpose of salinity control, water supply, navigation, recreation and wild life enhancement. The approval included a lock 56 feet in width and 100 feet in length.

The 1965 Act provided for the enlargment of the lock "authorized for construction in connection with the Wallisville Reservoir," in order to conform with the locks of the Trinity Project.

Congress appropriated funds for the Wallisville Project and construction on the Lake and Dam began in March 1966.

Livingston Reservoir, owned and operated by Houston and Trinity, and located about 100 miles upstream from the Wallisville Lake site, was completed in 1969. Up to 1971 Houston and Trinity had expended over $80,000,000.00 for the Reservoir and appurtenant facilities. Extensive conveyance facilities for water from the Wallisville Reservoir to the City of Houston are under construction. The cost of the total facility is esimated at $250,000,000.00. Coastal has sold bonds totalling $77,000,000.00 for the construction of a water distribution network from the Livingston-Wallisville system to serve NASA, and Harris and Galveston Counties.

In September 1959, Houston and Trinity entered into an agreement regarding water usage to be obtained from the Wallisville Project. The agreement as to usage was carried forward in a substituted contract executed in 1964. Under the agreement water released from Livingston will be conveyed in the natural river channel to the Wallisville Reservoir from which it will be pumped into various distribution systems. When Lake Livingston is operated conjointly with Wallisville, the two are expected to have an additional dependable yield of 133 million gallons per day above the combined yield of the two if operated independently. The contract provides that until the Wallisville Reservoir is completed and in operation Trinity, as operator of Livingston, is obligated to release a minimum of 1000 cubic feet per second of water from Lake Livingston in order to protect downstream users from saltwater intrusion. The water so released is equivalent to more than 50% of the yield of Lake Livingston. The result of the continued release will mean that Trinity and Houston will not have sufficient revenues from the system to meet the obligations incurred by them in respect to its construction and operation.

Appellants contend that the District Court first erroneously divorced the Wallisville Project from the Livingston-Wallisville system then compounded the error by marrying it to the Trinity River Project, without regard to the origin and purposes of Wallisville. They further contend that the court stretched nonsegmentation to unmerited lengths in its application to the facts of the case.

In Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., 5 Cir., 446 F.2d 1013, pp. 1022–1023, where it was sought to divide into three segments the North Expressway linking downtown San Antonio with the San Antonio In-

2. Rivers & Harbors Act of 1965. Pub.L. No. 89–298 § 301, 79 Stat. 1089, 1091.

3. Rivers & Harbors Act of 1962. Pub.L. No. 87–874, 76 Stat. 1173.

ternational Airport, and where it was contended that since no part of the middle, or parkland segment, was being taken the National Environmental Policy Act of 1969 (NEPA) did not apply, we disapproved such segmentation under both Federal Aid to Highways Act of 1968 [4] and NEPA.[5] We emphasized the fact that the Expressway was presented at the public hearing and for federal participation as a *single* project, and that there was nothing in the record to support the conclusion that it had "ever been anything but one project for purposes of federal approval."

The plaintiffs in Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973), vigorously maintained that an EIS was required on the whole 1877-mile Freeway-Express System of the State of Iowa, or at the very minimum the entire Freeway 518 Project from the Missouri line to the Minnesota line. The trial court held that to require an EIS over the entire system or even for Freeway 518 would be highly impractical. Although disagreeing with the court that a 14-mile segment was an appropriate segment for the EIS the appellate court did not accept plaintiffs' contentions, saying:

> "Because of the expensive nature and the unique characteristics of a network of highway routes comprising a statewide highway plan, coupled with the facts that such plans must of necessity be projected over a relatively long span of time and be flexible in order to allow modifications to meet unforeseen and untoward developments, we do not think the overall project is subject at the outset to the requirements of NEPA. . . .
>
> "[A]s a practical matter it is necessary to permit the division of a state highway plan into segments for the

purpose of environmental considerations. . . . . "

■ The rule against segmentation for EIS purposes is not an imperative to be applied in every case. Its application *vel non* may depend on the scope of the project. As in *Named Individual Members* singularity may compel its application. On the other hand as in *Indian Lookout Alliance* practical necessity may interdict its application.

The court held that the Wallisville Project "was and is, in fact, an important and essential component" of the Trinity Basin Project, and that it "is but the initial segment of the overall Trinity Project." Other statements of like import appear in the court's findings and opinion.

The Wallisville Project is miniscule in scope and cost when compared to the scope and estimated cost of the Trinity Project. Its cost will be less than 2% of the estimated cost of the Trinity Project. Since Wallisville is located at the mouth of the Trinity River, common sense and economy dictate that it be made compatible with the Trinity Project. It does not follow, however, that compatibility is necessarily antithetical to the separateness of the two projects, if otherwise they should be treated as separate projects within the context of NEPA. In this regard it is well to note that compatibility was not directed when Congress authorized the construction of Wallisville. The directive came three years thereafter when the Trinity Project was approved.[6]

Wallisville was separately authorized and separately funded by Congress. While Congress has continued year after year to appropriate funds for Wallisville, it has yet to appropriate any construction funds for Trinity. Appropriations for the latter have been limited to sums for engineering and environmental

4.  49 U.S.C.A. § 1653(f).

5.  See Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972), where it was held that a project for the construction of a circumferential highway around Richmond, Virginia, could not be split up into separate segments for the purpose of assessing environmental impact, but that the entire 75-mile beltway project had to be considered as a whole.

6.  See Note 2.

studies, and the alteration of highway bridges along the proposed route.

The element of time is materially important and cannot be ignored in determining the issue as to whether the projects are separate. Pursuant to the 1958 restudy resolution the Corps recommended the development of the Trinity Project over a period of from 40 to 50 years. Its ultimate completion is not a certainty, but depends on the wisdom and judgment, if not the moods and whims, of Congress. It has changed its mind before as respects the Trinity Project, and might well do so again. In contrast Wallisville is 72% complete and once construction is resumed can be completed in a relatively short period of time. Congress is not likely to now reject a project so near completion and for which it has already borne the major portion of the costs.

■ Twenty-nine percent of the total estimated cost of Wallisville had been incurred when NEPA became effective on January 1, 1970. In considering the overall equities, the extent to which Wallisville has been completed is a factor to be carefully weighed. See Arlington Coalition on Transportation v. Volpe, 4th Cir., 458 F.2d 1323, 1331.[7]

It is of importance and cannot be overlooked that Wallisville is a key component of the Livingston-Wallisville water conservation and storage system on which Trinity, Coastal and Houston are relying to supply the water needs of more than two million people, that enormous sums have already been expended in completing the first part of the Livingston-Wallisville system, and that other large sums have been obligated for the construction of a distribution network.

Apart from the Trinity Project the need for a saltwater barrier at the mouth of the Trinity River has long been recognized. The Wallisville dam will serve that function. Until its completion water equivalent to more than 50% of the yield of Lake Livingston will have to be released from that Lake in order to maintain a hydrostatic head of fresh water sufficient in strength to push back the saltwater intruding from the Gulf of Mexico into the Coastal canal which transports Lake Livingston water to Houston. The dam will avoid this waste of water.

The reservoir created by the Wallisville dam is required for the temporary impoundment of the water pending its transfer into the various distribution systems.

By conserving the rainfall runoff from the Trinity watershed below Livingston and operating the Livingston and Wallisville Reservoirs as a single system an additional yield of 133 million gallons of water daily can be obtained. Operated independently Wallisville would have a dependable yield of only 28 million gallons daily from the uncontrolled drainage area between the two reservoirs. Weighing these facts it becomes clear that the Wallisville Project when operated in conjunction with Livingston will play such an important role in water resources development and conservation in the lower Trinity River that it must be viewed as an integral part of the Livingston-Wallisville system.[8]

When Congress approved Wallisville in 1962 it cited five local purposes as justification for construction. Not one of those purposes related to or was dependent upon the Trinity River Project, which then existed solely on the drawing boards of the Corps. In making appropriations for the two projects Congress has consistently considered Wallisville as separate from Trinity.

Beginning on March 14, 1973, a date subsequent to the opinion and order in

7. Also, Environmental Defense Fund v. Corps, 8th Cir., 470 F.2d 289 at 301, and Ragland v. Mueller, 5th Cir., 460 F.2d 1196.

8. Writing in June 1966 then Governor John Connally stated that the Livingston Reservoir upon which construction had begun was designed to operate in connection with the Wallisville Project. (Ex. 8 to the Wallisville EIS)

this cause, hearings were held before the appropriate Subcommittees of the House and Senate. Major General Harold R. Parfitt, the Corps Southwestern Division Engineer, advised the Subcommittee of the House that there was an injunction against the Corps enjoining it "from constructing the Wallisville lock and dam as well as the Trinity Navigation Project," and that as a result of the injunction the Corps foresaw no requirements for fiscal year 1974 funds for Wallisville.[9]

Justification for Wallisville appears at pages 1654–1657 of the Hearings.[10] Later in the hearing General Parfitt again expressed the view that pending the dissolution of the injunction, "we will not presently require the $3,100,000 presently in the budget for Wallisville Lake."[11] The Subcommittee was fully aware of the stage of completion of Wallisville as plainly appears from the following statement and interrogation:

"Mr. Robinson. On page 87, when we talk about the Wallisville Lake project in Texas, here is one again that is 98 percent complete, or will be with the 1974 appropriation, and it is one of those against which a suit has been filed by environmentalists, and the project has more or less been stopped. The question is, what in the world would be the value of a suit of this sort, even in the event it was successful, against a project that is practically complete? What would you, or what would we do, with Wallisville Lake in this connection?

General Parfitt. Sir, we would do nothing. The plaintiff's attitude is that they don't want closure made. We have not yet made closure.

Mr. Robinson. That is the only remaining item really involved?

General Parfitt. Basically, yes, sir.

Mr. Robinson. The work is done, and once you have closure the water would be in the lake, is that right?

General Parfitt. That is right, sir."

Justification for the Trinity Project was separately considered.[12]

The hearings before the Senate Subcommittee followed substantially the same course.[13]

There were further hearings on May 23, 1973, by both Subcommittees.[14]

On June 24, 1973, the House Report approved the requested $3.1 million for Wallisville.[15]

On June 26, 1973, the Senate Subcommittee had a further hearing[16] and based upon the testimony of Major General J. W. Morris, Director of Civil Works, that because of the injunction the appropriation for Wallisville was not needed[17] the Senate Report deleted the appropriation.[18] When the House-Senate Conference Committee met on July 26 to resolve the difference, the appropriation of $3,100,000 for Wallisville was restored.[19] The Appropriation Act for 1974 accepted the Conference Committee's Report and authorized the appropriation.[20]

■ Although the Congressional action referred to occurred subsequent to the court's opinion and order such action will receive judicial notice by this Court. Johnson v. Stevenson, 5th Cir., 170 F.2d 108; Savannah River Electric Co. v. Federal Power Commission, 4th Cir., 164

9. Hearing of the Subcommittee of the House —Public Works for Water and Power Development and Atomic Energy Commission Appropriation Bill 1994—Part 2, p. 1567.

10. Id.

11. Id. p. 1808.

12. Id. pp. 1565–1566, 1587–1589.

13. Senate Subcommittee Hearings—Part 2, pp. 1491–1750, specifically pages 1495, 1542–43, and 1620–1624.

14. Part 6—House Subcommittee—pp. 998–1018 as to Wallisville, and pp. 1095–1119 as to Trinity, and Part 6—Senate Subcommittee—pp. 7233–7261 as to Wallisville, and pp. 7310–7408 as to Trinity.

15. Report No. 93–327, p. 36. 93rd Congress, 1st Session.

16. Senate Hearings—Part 7, pp. 7558–7817.

17. Id. p. 7768.

18. Senate Report No. 93–338, pp. 24–26.

19. House Report No. 93–409, July 26, 1973.

20. Public Law 93–97—93rd Congress, H.R. 8947, August 16, 1973.

F.2d 408; 31 C.J.S. Evidence § 43 at 995.

The course of the Congressional hearings discloses that body continues to regard Wallisville as a project separate from the Trinity River Project. It also demonstrates that, with full knowledge of the detriments and benefits of the project, the stage of completion, the outstanding injunction, and of the objections to further construction, Congress thought the Wallisville Project should receive contingent funding despite the Corps' withdrawal of its request therefor. While this Congressional action is not a considered, debated determination that the project should proceed notwithstanding environmental objections, cf. Environmental Defense Fund, Inc. v. Corps of Engineers, 492 F.2d 1123, p. 1141, 5 Cir., 1974, it does indicate that Congress wished to expedite the construction of this project, if and when it becomes possible, and to do so regardless of the outcome of litigation related to Trinity River construction.

■ We conclude that the Wallisville and Trinity River Projects are not interdependent. The nexus between the projects is not such as to require an EIS evaluation of the Trinity Project as a condition precedent to an EIS evaluation of Wallisville. The Wallisville EIS should speak for itself. Wallisville is a separate viable entity. It should be examined on its own merits. Although it has been made compatible in certain of its features with Trinity it is not a mere component, increment, or first segment of Trinity. The court erred in so holding.

The Trinity River Project when originally authorized in 1965 [21] encompassed, or at least referred to eleven projects, namely: (1) the Multiple-purpose Trinity River Channel; (2) levee work near Liberty, Texas; (3) Tennessee Colony Dam and Reservoir; (4) Water Conveyance Facilities; (5) Dallas Floodway

Extension; (6) West Fork Floodway; (7) Elm Fork Floodway; (8) Lakeview Dam and Reservoir; (9) Aubrey Dam and Reservoir; (10) Roanoke Dam and Reservoir; and (11) Duck Creek Channel Improvement. At various times since 1968 Congress has appropriated funds for the engineering and design of nine of these projects. Two (2) and ten (10) are totally dormant at this time. Because they are interrelated from design, construction, and operational standpoints, five of the projects, namely, one (1), three (3), four (4), five (5) and six (6) have been consolidated into one item in the appropriation bills.[22] These five components are in the stage of planning and design. No engineering detail, which is in draft stage, is included in the present Trinity River Project General Design Memorandum (Phase 1). The EIS for these components is being drafted.

The court has prescribed certain guidelines to supplement those promulgated by the Council on Environmental Quality (CEQ) and NEPA, and as to both Wallisville and Trinity has required that the revised Wallisville EIS and the Trinity EIS be "submitted to the Congress, the CEQ, and other appropriate agencies for full review and authorization."

The opinion further states that:

"It is the intent of this Court, in view of the circumstances in this case, that Congress, the appropriate federal agencies and the Council on Environmental Quality pass upon and render decisions on the Wallisville and Trinity Projects as well as other components in the light of NEPA as passed by Congress."

■■ NEPA makes no provision requiring Congressional or agency reauthorization of an agency's undertaking to comply with the Act respecting an impact statement. We have clearly held that "CEQ was not given authority to

21. See Note 2.

22. See Hearings before the Subcommittee on Appropriations, U.S. Senate, 91st Congress, First Session—Appropriations for 1970. H.R.14159 pp. 517–522.

prescribe regulations governing compliance with NEPA." Hiram Clarke Civic Club v. Lynn, 5 Cir., 476 F.2d 421. An environmental impact statement is to be "filed" with CEQ, but the Act does not require CEQ approval. The court erred in directing the Corps to develop new guidelines to implement those promulgated by CEQ and NEPA. The latter guidelines with the current guidelines of the Corps [23] will provide sufficient guidance for the preparation of a new or revised EIS. Environmental Defense Fund, Inc. v. Froehlke, 8th Cir., 473 F.2d 346, and Environmental Defense Fund, Inc. v. Corps of Engineers, 8th Cir., 470 F.2d 289.

It need hardly be observed that Trinity is an extensive, complex, and multifaceted project. The court's action in requiring guidelines for an EIS, yet to be filed, more onerous than those noted, exacts a burden that finds no warrant in the Act or the decisions.

Appellants inject the issue as to whether the injunction forbids the further planning and design of Trinity pending the filing and approval of an EIS.

We are not informed whether appellants' concern relates to the possible prohibition of planning and design as the same may involve the preparation of an EIS. But if we so assume, we note that it is not shown to what extent planning and design information may be needed, or what consideration has been given to such, in the preparation of the EIS for the Trinity Project, nor what, if any, additional information of that nature may be required for its completion. On a project of the scope of Trinity the use of some planning and design information in the preparation of an EIS would appear to be necessary to sustain its sufficiency.

In Upper Pecos Association v. Stans, 10th Cir., 452 F.2d 1233, the court held that "the project must be of sufficient definiteness before an evaluation of its environmental impact can be made and alternatives proposed." While in Scientists' Institute for Public Information v. Atomic Energy Commission, 156 U.S. App.D.C. 395, 481 F.2d 1079, the court in addressing itself to the timing of the statement, stated that an EIS "ought not to be modeled upon the works of Jules Verne or H. G. Wells," or written at such late date that "the purposes of NEPA will already have been thwarted."

Rule 65 F.R.Civ.P. directs that every order granting an injunction "shall be specific in terms," and "shall describe in reasonable detail . . . the act or acts sought to be restrained." Furthermore it is the general rule that an injunction does not prevent acts which are not within its terms as reasonably construed. 43 C.J.S. Injunctions § 215 at 949. It nowhere appears that the court enjoined further planning and design of the Trinity Project and it will not be so deemed.

Although in our April 19, 1974, decision in *Environmental Defense Fund, supra,* we pretermitted a decision on the extent of judicial review respecting the cost-benefit ratio pertaining to the interest rate factor [24] because Congressional action had displaced the necessity and propriety of court review, we nevertheless expressed agreement with the court's decision in Montgomery v. Ellis,

23. Federal Register. Vol. 39, No. 68—Monday, April 8, 1974. Part 209—Administrative Procedure.

24. The interest rate formula is now governed by the *Water* Resources Development Act—Public Law 93–251, 93rd Congress, H.R. 10203, March 7, 1974, Sec. 80, subsection (b), provides:
"In the case of any project authorized before January 3, 1969, if the appropriate non-Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-Federal share of project costs, the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after the date of enactment of this Act."

364 F.Supp. 517 (N.D.Ala.), approving such a review. We also expressed agreement with the decision of the Eighth Circuit in Environmental Defense Fund v. Froehlke, *supra,* that NEPA "requires a more comprehensive and pervasive weighing of costs and benefits." than 33 U.S.C. Sec. 701a contemplates.[25] We see no need to further explore the issue at this juncture.

■ Appellants insist that the court applied an inappropriate burden of proof requirement. The court held that:

"[O]nce a prima facie showing has been made that the federal agency has failed to adhere to the requirements of NEPA, the burden must, as a general rule, be laid upon this same agency which has the labor and public resources to make the proper environmental assessment and support it by a preponderance of the evidence contained in the impact statement."

No authority is cited to sustain this holding. In *Environmental Defense Fund, supra* (1974), we upheld the action of the court in applying the standard burden of proof procedure. We referred to the decision of the court below in this action, but declined to make a declaratory ruling since the facts and issues in this case were not then before us. We see no reason for not likewise applying the standard burden of proof procedure in this case. On another trial plaintiffs will have the burden of establishing their claims by a preponderance of the evidence without any technical shifting of that burden.

Trinity and Coastal insist that the court erred in granting motion for summary judgment. As the case must be reversed on other grounds we need not rule on the correctness of the court's action in granting plaintiffs' motion for summary judgment or in denying the motion of the Corps. Upon a rehearing the record may present a case for summary judgment, or it may require a hearing on the merits in whole or in part. We are not persuaded that environmental actions should be treated differently from other actions in this respect. In *Named Individual Members, supra,* we said:

"If that issue [a factual dispute] were material therefore, the mere existence of a disputed fact manifestly would require us to reverse the district court's summary judgment, since summary judgment is always improper when there are disputed issues of material fact."

The applicable principles relating to the granting and denying of motions for summary judgment are clearly enunciated in National Screen Service Corp. v. Poster Exchange, Inc., 5th Cir., 305 F.2d 647, and need not be restated.

The CEQ guidelines make a distinction between those projects initiated before the effective date of NEPA and those after its effective date. For the latter an EIS is required "to the fullest extent possible," for the former "to the maximum extent *practicable.*" Environmental Law Fund v. Volpe, N.D.Cal., 340 F.Supp. 1328, 1331.[26] While the guidelines are merely advisory, Hiram Clarke

25. Before the enactment of the Administrative Procedures Act, 5 U.S.C. Sec. 702 et seq., the Supreme Court had held that 33 U.S.C. Sec. 701a created no right to judicial review of the benefit-cost analysis it required. Oklahoma v. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487.

26. "Guidelines for Federal Agencies under the National Environmental Policy Act, 36 Fed.Reg. 7724, 7727 (1971):

'11. *Application of section 102(2)(C) procedures to existing projects and programs.* To the maximum extent practicable the Section 102(2)(C) procedure should be applied to further major federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program.'"

v. Lynn, *supra*, they nevertheless recognize the overall equities that are to be considered in weighing an ongoing project and the stage of its completion in determining compliance with EIS requirements under the Act. They are consistent with the decisions in this respect.[27] As observed in the Gillham Dam case, Environmental Defense Fund, Inc. v. Corps, 470 F.2d 289, 295, several courts have held that the agency involved may approach the required compliance with NEPA as respects an EIS differently from what might be required with regard to new projects. In Environmental Defense Fund v. Corps, *supra*, 1974, we adopted the test applied in that case that the approach even as to an ongoing project is that of "good faith objectivity."

The court's decision Linking Wallisville with Trinity and requiring the Wallisville EIS to evaluate not only the environmental impact of Wallisville, but also to assess some or all of the effects of the Trinity Project, and the latter's effect upon Wallisville, cannot be sustained in view of our holding that the Wallisville EIS must be separately considered and determined.

It was error to make Wallisville an evidentiary hostage of Trinity.[28] The holding if permitted to stand could well spell the doom of the Wallisville Project in view of the continuing uncertainties attending the Trinity Project.[29]

■ Notwithstanding that the matter has already been considered from another approach, in view of the court's statement that when a conflict arises between the Corps and the agency making an evaluation that the Act obligates the Corps in most instances to "defer" to that evaluation, we deem it not inappropriate to observe that the word as so employed must yield to the language of the Act[30] which does not lend itself to a construction that the agency making the evaluation is vested with authority to veto the evaluation of the Corps.

The trial court has dealt at length with the disclosures of the Wallisville EIS as it relates to archeological sites, water quality, population and industrial expansion, damages to wildlife, waterfowl and fish estuarine damage[31], and as to the benefit-cost ratio.[32]

A review of the EIS reveals the very considerable effort expended in its preparation and the time required in the task. A preliminary draft was completed in October 1970. There followed a number of modifications and changes resulting from comments received, and responses to new and altered guidelines issued during the course of its preparation. The final draft filed with CEQ contains 101 pages, with more than double that number of pages of exhibits. It contains forty-six pages of comments of various public and private agencies and individuals opposed to the project, objections to its sufficiency, and the Corps' response thereto.

---

27. Arlington Coalition on Transportation v. Volpe, *supra*. Environmental Defense Fund v. Corps, and Ragland v. Mueller, Note 7.

28. The court ruled that injunction would be dissolved if on further hearing the EIS satisfied the requirements of NEPA, and then stated:

"On the other hand, if such evidence is inadequate under the law and the claimed primarily local purposes are not demonstrated, the Wallisville Project will then be considered by this Court only as the first segment of the Trinity Project. Further construction of Wallisville will then be delayed pending completion, review, and acceptance of the Trinity environmental impact statement as outlined in the following sections of this opinion."

29. On March 13, 1973, voters in the Trinity River Basin rejected a tax levy and bond issue with which it was proposed to obtain the necessary local funds to finance the costs of the Trinity River Project. That action casts further doubt on the future of the project. The election did not involve Wallisville, which had already been approved.

30. Section 102(C) of the Act directs that prior to the making of any detailed statement, "the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved."

31. 359 F.Supp. pp. 1349–1356.

32. Id. pp. 1364–1380.

The Corps has tabulated the court's criticism of the Wallisville EIS juxtaposed against the contents of the document and vigorously asserts its sufficiency. The other appellants concur and are equally firm in their views. Appellees reply in detail. We have considered the court's assessment of the insufficiencies of the disclosures. The disclosures respecting population and industrial expansion are clearly inadequate.[33] Without particularizing in detail, the inadequacies of the other disclosures consist not so much in the dearth of information and supporting data, but in the lack of, or insufficient, evaluation. The insufficiencies are such as to require the preparation and filing of a revised or supplemental EIS on the Wallisville Project. In compliance with this requirement, the Corps should be accorded a reasonable opportunity to conduct further studies or hearings prior to another trial in order to establish that it has fully taken into account all significant environmental information related to the project. The statement will be adjudged anew on the basis of its compliance with Sec. 102 tested by its "good faith objectivity rather than subjective impartiality," Environmental Defense Fund v. Corps, 8th Cir., 470 F. 2d 289, 296, without an overriding concern for the Trinity Project. Directions that the statement to be prepared and filed will conform to NEPA and the established guidelines will suffice.

The court directed the Corps to prepare a new environmental impact statement, either as to Wallisville alone, or for the entire Trinity Project.

The Corps need not submit a new impact statement on the Wallisville Project, but will submit a revised or supplemental statement. The sufficiency of such statement and of the statement on the Trinity Project will each be judged by the guidelines herein indicated and considered on its own merits.

33. 42 U.S.C.A. Sec. 4331(b)(5), and Sec. 4371(a)(3). CEQ Guidelines Sec. 6(a)(11), (111), 36 Fed.Reg. 7725, Environmental De-

The injunction as to each project will continue in force pending the determination of the sufficiency of the respective statements. However, it will be modified to conform with this opinion in the particulars detailed herein.

The judgment is reversed and the case is remanded for further proceedings not inconsistent herewith.

fense Fund v. Corps, 325 F.Supp. 728, 748 (E.D.Ark.).