816 F.2d 205
 25 ERC 1993, 17 Envtl. L. Rep. 20,817
 SIERRA CLUB, et al., Plaintiffs-Appellees,
v.
Robert F. FROEHLKE, Etc., et al., Defendants-Appellants,
Trinity River Authority of Texas, and Chambers-Liberty
Counties Navigation District, et al.,
Intervenors-Defendants-Appellants.
 No. 86-2247.
 United States Court of Appeals,
Fifth Circuit.
 May 11, 1987.
 
 Warren G. Clark, Anahuac, Tex., for Chambers-Liberty.
 James R. Gough, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for U.S.
 James H. Keahey, Austin, Tex., for Trinity River Authority of Texas.
 Charles L. Berry, Sharon M. Mattox, Houston, Tex., Richard D. Milvenan, Austin Tex., for City of Houston.
 Paul Elliott, Asst. Atty. Gen., Austin, Tex., for State of Tex.
 Raymond B. Ludwiszewski, Robert L. Klarquist, David C. Shilton, U.S. Dept. of Justice, Land & Natural Resources Div., Appellate Section, Washington, D.C., for John O. Marsh.
 Rayburn Berry, Houston, Tex., Robert G. Dreher, Washington, D.C., for Sierra Club, Houston Audubon Soc.
 Appeals from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, GEE and REAVLEY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 This is an appeal from the district court's judgment refusing to lift the permanent injunction that halted construction of the Wallisville Lake Project (Wallisville) in 1973. In 1985, the United States Army, Corps of Engineers (the Corps) filed a motion with the district court to have the injunction dissolved, arguing that they had fully complied with its terms. Also supporting dissolution of the injunction were intervenors, the Trinity River Authority of Texas, the City of Houston, and the Chambers-Liberty Counties Navigation District. The Sierra Club Environmental Protection Fund, and others (collectively referred to as Sierra Club), challenged the Corps' motion, contending that the Corps had failed to satisfy the terms of the injunction by not adhering to the procedural requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4347, following entry of the injunction. Furthermore, Sierra Club argued that the Corps' final environmental impact statement was inadequate. The district court found that the Corps had departed from the procedural requisites of NEPA, but did not rule on the question of the adequacy of the environmental impact statement. Sierra Club v. Froehlke (Wallisville II), 630 F.Supp. 1215 (S.D.Tex.1986). We disagree that the Corps violated NEPA, and further find that if the district court had considered the question, it could only have found that the final environmental impact statement was adequate. We reverse the judgment, vacate the injunction, and dismiss the case.
 
 
 2
 * History of the Wallisville Litigation
 
 
 3
 Like most environmental litigation we see, this case has a long history and is mired in an alphabet soup of acronyms. As originally authorized in 1962, the Wallisville Lake Project was to span 19,700 acres, and serve five purposes: salinity control, water supply, fish and wildlife enhancement, navigation and recreation. Construction began on the project in 1966. In 1969 Congress enacted the National Environmental Policy Act (NEPA), 42 U.S.C. Secs. 4321-4347. Although approximately 28% complete when NEPA became law, the Corps had to draft and circulate an environmental impact statement (EIS), which it did in 1970. The next year, the Sierra Club brought suit seeking to enjoin construction of the project, alleging numerous deficiencies in the EIS.
 
 
 4
 The trial court granted Sierra Club's motion for summary judgment and enjoined further construction of Wallisville. In a lengthy opinion the trial court listed innumerable deficiencies from which the 1971 EIS suffered. Sierra Club v. Froehlke, 359 F.Supp. 1289 (S.D.Tex.1973). The project was 72% complete when it was enjoined. On appeal, we reversed, but left the injunction in place until certain deficiencies in the EIS were corrected. Sierra Club v. Callaway (Wallisville I), 499 F.2d 982 (5th Cir.1974). We held that on remand the Corps only had to submit a supplemental EIS; a new EIS was not required. We further stated that the supplemental report would be judged anew on the basis of its compliance with NEPA, with the burden of proof on Sierra Club to show noncompliance. Id. at 992.
 
 
 5
 Subsequent to our 1974 opinion, the Corps reconsidered the scope and impact of Wallisville, and decided to revise the project. The modified project drastically reduced the size of the reservoir, from the original 19,700 acres to 5,600 acres restricted to an area east of the Trinity River. Instead of describing these changes in a supplemental report, the Corps prepared an entirely new EIS. The draft EIS was filed with the Environmental Protection Agency (EPA) in July, 1979, and circulated to interested agencies and individuals for comment. The EIS was revised in response to these comments, and the final EIS, along with the Post-Authorization Change Report (PACR--hereinafter referred to together as the "EIS-PACR"), were released to the public in July, 1981.
 
 
 6
 In October, 1981, the EIS-PACR was forwarded to the Board of Engineers for Rivers and Harbors (BERH) for review. At BERH concern arose regarding whether the modified design so altered the original project that congressional authorization would be needed before construction could resume. In particular, the EIS-PACR deleted two of the original benefits--fish and wildlife enhancement and navigation--slated for Wallisville when Congress authorized the project in 1962. BERH sent the EIS-PACR to the Office of Chief of Engineers (OCE) for resolution of this policy issue. OCE thereupon requested the Corps to prepare a supplemental report, the Supplemental Information to the Post-Authorization Change Report (SIPACR), to aid the Chief of Engineers to determine the scope of his discretionary authority with respect to the project. The seventeen-page SIPACR, dated July, 1982, recalculated the economic benefits of Wallisville, and concluded, contrary to the EIS-PACR, that the project would indeed enhance fish and wildlife, and benefit navigation. The SIPACR recommended that the Chief of Engineers could exercise his discretionary authority to approve construction without Congressional authorization, since all five project purposes were served by the modified design.
 
 
 7
 On July 30, 1983, before OCE acted on or adopted the Corps' recommendation, Congress authorized the modified Wallisville project, and in so doing referenced the SIPACR. Supplemental Appropriations Act, Pub.L. No. 98-63, 97 Stat. 301, 311 (1983). The SIPACR, however, had been intended for internal purposes only, and had never been subjected to any form of NEPA review. The parties dispute how Congress obtained the SIPACR; but despite Sierra Club's protestations to the contrary, there is no evidence that the Corps surreptitiously forwarded a copy of the report to Congress in order to evade NEPA. However Congress obtained the report, the Corps faced a "procedural quandary": Congress had authorized the project apparently relying in part on a document never subjected to public comment--indeed, a document never made publicly available.[1]
 
 
 8
 Responding to the perceived predicament created by Congress' action, the Corps released the SIPACR for public review and comment in September, 1983. A supplemental information report (SIR) was prepared and released in February, 1984, containing comments received during preparation of the EIS-PACR, comments on the SIPACR, and the responses to those comments. Brigadier General Robert J. Dacey, Southwestern Division Engineer, in a record of decision (ROD) dated February 25, 1984, found the project to be in compliance with the applicable environmental laws and regulations, and approved the project.
 
 
 9
 On November 1, 1985, Congress again took action appropriating funds for Wallisville. Energy and Water Development Appropriation Act, Pub.L. No. 99-141, 99 Stat. 564 (1985). Referencing virtually every document available--the 1981 EIS-PACR, the 1982 SIPACR, the 1984 SIR, and the 1984 ROD--the House and Senate committee reports "urge[d] the earliest possible completion of the project." H.R.Rep. No. 195, 99th Cong., 1st Sess. 37 (1985); S.R.Rep. No. 110, 99th Cong., 1st Sess. 41 (1985).
 
 II
 
 10
 The many plot twists in this case have resulted in a complex intertwining of the administrative and legislative processes. Untangling this jumble reveals essentially three questions for our consideration. The primary question, considered in this section of our opinion, concerns the true nature of the 1982 SIPACR, and whether it required review and refinement as a supplemental environmental impact statement (SEIS) under NEPA. In the following section we turn to the question, not ruled upon below, of the substantive adequacy of the 1981 EIS-PACR. In the final section, we interpret the 1983 legislation that authorized the Wallisville project prior to the Corps' completion of its required review.
 
 
 11
 When is a SIPACR a SIR and Not a SEIS?
 
 
 12
 Although NEPA does not specify when a supplement to an EIS must be filed, the Corps' regulations dictate that "[a] Supplement to the draft or final EIS on file will be prepared whenever significant impacts resulting from changes in the proposed plan or new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action."[2] 33 C.F.R. Sec. 230.11(b) (1986) (emphasis added). In making its determination whether to supplement an existing EIS because of new information, the Corps should consider "the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS." Wisconsin v. Weinberger, 745 F.2d 412, 418 (7th Cir.1984), quoted in Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1051 (5th Cir.1985). The change need not be strictly environmental, however; the test is whether the new information so alters the project's character that a new "hard-look" at the environmental consequences is necessary. Id.
 
 
 13
 A party challenging the Corps' decision not to supplement an existing EIS bears two burdens: first, demonstrating "a substantial environmental issue," and second, showing, with respect to this substantial environmental issue, that the Corps acted unreasonably when it did not file a SEIS. Environmental Defense Fund v. Marsh, 651 F.2d 983, 992 (5th Cir.1981); see Enos v. Marsh, 769 F.2d 1363, 1373 (9th Cir.1985). But not every new circumstance, however small, requires filing a SEIS; the new circumstance must present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned. Wisconsin v. Weinberger, 745 F.2d at 421. If the party challenging the Corps' decision raises a substantial environmental issue, it must next show that the Corps did not act reasonably with respect to this issue. " 'The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and in good faith on a reviewable environmental record.' " Louisiana Wildlife Federation v. York, 761 F.2d at 1052 (quoting Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 644 (5th Cir.1983)).
 
 
 14
 The Sierra Club argues that the Corps seriously altered the environmental picture of the Wallisville project when it reinstated fish and wildlife enhancement and navigation benefits as project purposes in the SIPACR. We disagree. It is true that the EIS-PACR deleted fish and wildlife enhancement, and deferred navigation benefits as no longer viably included as project purposes under the modified design; but in reaching the different conclusion stated in the SIPACR, the Corps did not examine any environmental impacts not previously contemplated in the EIS-PACR.
 
 
 15
 At the time of the EIS-PACR, the Corps believed that the excess project lands, or all of the project lands if Wallisville were abandoned, would be preserved in public ownership. Based on this assumption, the Corps had deleted fish and wildlife enhancement from the list of project purposes, because the Wallisville area was near optimum biological productivity without the project. The current level of scientific expertise did not allow the Corps to enhance marine life in the area beyond its natural state. The report cautioned, however, that "predictions of the future status of fish and wildlife cannot be considered reliable until the exact disposition of land is determined." Nonetheless, the EIS-PACR ultimately found it likely that, in the event the project were abandoned, the lands would remain publicly preserved, and thus the high environmental quality of the area would remain.
 
 
 16
 Subsequent to the development of the EIS-PACR, the assumption that abandoned or excess project lands would remain publicly controlled was thrown into doubt by Executive Order No. 12,348, which eliminated cost free transfers of land among federal agencies. 3 C.F.R. 134 (1983), revoked by Exec. Order No. 12512, 3 C.F.R. 340 (1986), reprinted in 40 U.S.C. Sec. 486 note. Thus the Corps could no longer be confident that the lands not developed by the project would be transferred to an interested wildlife agency (e.g., Fish and Wildlife Service) as originally anticipated. In the SIPACR, the Corps made the assumption that if the project were abandoned, "local interests would develop the water supply potential of the Wallisville site," and that "the project lands not required for the local project would most likely be acquired by real estate developers and subdivided for resale." Significant fish and wildlife losses were associated with such private development and these losses were quantified in the SIPACR. With the assumption that project lands would be subject to private development, fish and wildlife enhancement returned as a project purpose in the SIPACR: "[s]ince the degradation prevented by the modified project is greater than the degradation it causes, the project produces net fish and wildlife gains."
 
 
 17
 The Sierra Club also complains that whereas the EIS-PACR deferred navigation improvements, the SIPACR found that the project included navigational benefits. The 1981 report had analyzed improvements to navigation initially proposed as part of the Wallisville project, but determined that the cost benefit ratio of these improvements did not support their construction, and recommended their deferral. Yet even without these improvements, construction of the project created small incidental benefits to navigation. Because of the small size of the navigation benefits, however, these improvements were not calculated in the EIS-PACR. But in 1982, in response to the inquiry from OCE, these benefits were reduced to dollar terms to help explain the retention of a navigation purpose.
 
 
 18
 Sierra Club relies heavily on Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1051 (5th Cir.1985), in which this court required the Corps to reconsider a conclusion of its final EIS that became uncertain after our decision in Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897 (5th Cir.1983). In York, the Corps had stated in its final EIS that 17,300 acres of bottomland hardwood forest would be cleared with or without the project, because of the agricultural needs of private landowners. In Avoyelles, however, this conclusion was put in doubt when we held that a private landowner's clearing of land for agricultural use was subject to certain permit requirements. Id. at 920-27. We ruled in York that the Corps had to file a supplemental EIS if "there is a reasonable possibility that a significant number of [the 17,300] acres will not be cleared except for the Project, and that therefore the Project may have significant additional impacts not considered in the final EIS." 761 F.2d at 1051.
 
 
 19
 The situation in the present case is very different than the one we confronted in York.[3] In York, the Corps concluded in the final EIS that the bottomland hardwoods would be cleared with or without the project. Here, in contrast, the EIS-PACR contained only a speculative conclusion. The Corps expressly conditioned its EIS-PACR findings regarding future fish and wildlife effects on the eventual disposition of the project lands. In analyzing the consequences of private development if the project was not built, the Corps simply reconsidered an issue left unsettled in the earlier report; the SIPACR occasioned no change in environmental impacts or consequences of the project. Similarly, the navigation benefits discussed in the SIPACR resulted simply from a quantification of benefits already present in the EIS-PACR. We conclude, therefore, that because the SIPACR did not seriously alter the environmental picture from what was contemplated in the EIS-PACR, the Corps did not have to prepare a SEIS.
 
 
 20
 Notwithstanding our conclusion that a SEIS was not necessary in this case, the SIPACR clearly expanded the environmental picture from what was envisioned in the EIS-PACR. Use of the SIPACR in the decisionmaking process, unchecked by some measure of public review and comment, surely would violate NEPA's concern with the procedural integrity with which agencies consider environmental factors. See Sierra Club v. Morton, 510 F.2d 813, 820 (5th Cir.1975). Because of the bizarre set of circumstances leading to public disclosure of the SIPACR, however, we do not know what use, if any, the OCE would have made of the report if it had not become public the way it did. But once Congress referenced the report in the 1983 authorizing legislation, NEPA clearly became implicated.
 
 
 21
 Although a SEIS is required only under special circumstances, information produced and used by the Corps that does not seriously change the environmental picture, but that nevertheless affects, or could affect, the decisionmaking process, is subject to the procedural requirements of NEPA. See, e.g., Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068, 1072-74 (1st Cir.1980) (environmental study found only in the administrative record fails to satisfy NEPA's circulation requirements). Corps regulations recognize that supplemental information not requiring filing of a SEIS can be prepared and used by an agency without circulation of a draft document or formal coordination with other agencies. Under the Corps' regulations, however, SIRs should be prepared and filed with the EPA when "necessary to provide supplemental information to a point of concern discussed in the final EIS (and such point of concern was considered in making the decision on the proposed action)." 33 C.F.R. Sec. 230.11(d) (1986) (emphasis added). The regulations state further that "[t]he report will be circulated for information to concerned agencies and the interested public who provided comments on the draft and/or final EIS at the same time it is filed with EPA." Id.
 
 
 22
 In September, 1983, shortly after Congress passed authorizing legislation referencing the SIPACR, the Corps made the SIPACR available for public review and comment. The following February, the Corps prepared and released a SIR containing comments received during preparation of the final EIS, comments on the SIPACR, and the responses to those comments.
 
 
 23
 As a general matter, we do not condone post hoc review of, or rationalizations for, decisions already made. We recognize and assign great importance to NEPA's review and comment procedures for obtaining and incorporating opposing viewpoints into the final EIS, and thus into the heart of the decision process. See Fritiofson v. Alexander, 772 F.2d 1225, 1246 (5th Cir.1985); California v. Block, 690 F.2d 753, 770-71 (9th Cir.1982). However, when a supplemental report does not seriously alter the environmental picture, but only expands the picture previously examined, the post hoc review and comment required with the preparation of a SIR can satisfy the central concerns of NEPA. We find that the review provided by the SIR in this case supplied an adequate check on possible misuse or misunderstanding of the information presented in the SIPACR. Obviously the comments received subsequent to preparation of the SIPACR did not influence, and could not change, the views presented in that report. Nonetheless, this public comment and review was an important and effective component of the overall process. General Dacey had this input, as well as the rest of the administrative record, before him prior to his issuance of the ROD. We conclude, therefore, as a matter of law, that the Corps' handling of the SIPACR following Congress' action in 1983 was a reasonable response to the situation existing at that time.
 
 III
 Measuring the Adequacy of the Final EIS
 
 24
 The court below premised its holding on its belief that the Corps had unlawfully departed from the dictates of NEPA, but in its opinion never reached the principal issue raised in opposition to dissolution of the injunction: the substantive adequacy of the final EIS (i.e., the EIS-PACR). Ordinarily, in view of our ruling in the previous section, we would remand this issue for factual determination by the trial court. But this case is by no means ordinary. First, we note that delay alone can be a most effective and fatal weapon in environmental litigation. The order enjoining construction of the Wallisville project now nears its fifteenth anniversary. This case has been tried twice on the merits, and has had as many appeals; and the administrative and court record on this matter now stretches out over forty-seven volumes. Most importantly, however, having thoroughly reviewed this capacious record, we find that it permits only one resolution of the factual issue.[4] Pullman-Standard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982); see also Anderson v. City of Bessemer, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Remanding this matter to the trial court would result only in further delays in construction, additional cost to all those concerned, and a waste of judicial time.
 
 
 25
 As we have previously stated, "[t]he role of this Court in reviewing a disputed EIS is strictly limited." Isle of Hope Historical Association, Inc. v. United States Corps of Engineers, 646 F.2d 215, 220 (5th Cir.1981). Our review of an agency's compliance with NEPA is guided by a "rule of reason," and we will not "fly speck" an EIS. Texas Committee on Natural Resources v. Marsh, 736 F.2d 262, 266 (5th Cir.1984), modified, 741 F.2d 823 (1984); Sierra Club v. Sigler, 695 F.2d 957, 965 (5th Cir.1983). As explained in Isle of Hope, we generally consider three factors when evaluating an EIS:
 
 
 26
 (1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.
 
 
 27
 646 F.2d at 220. The Sierra Club bore the burden of proof at trial to demonstrate the inadequacy of the EIS. Wallisville I, 499 F.2d at 994; see also Texas Committee on Natural Resources, 736 F.2d at 270 ("it is the party seeking to invalidate an EIS, not the agency, which has the burden of proof") (emphasis in original).
 
 
 28
 The Sierra Club concentrates its argument on the first element of the Isle of Hope test arguing that the Corps has not taken a good faith hard look at the environmental consequences of Wallisville. In particular, Sierra Club presented evidence at the hearing on its belief that the EIS-PACR failed to adequately assess the project's impacts upon the adjacent marshes and Trinity Bay from reductions of freshwater flow and trapping of sediments caused by the reservoir. The reduced freshwater flows, Sierra Club contends, will result in significantly increased salinity levels in, and a drastic reduction of sediments flowing into, the marshes and Bay. Both plaintiff's and defendant's experts at the hearing agreed that, in theory, increased salinity levels and a decreased flow of sediments would adversely effect marsh and Bay life. Particularly affected would be the oyster and shrimp populations made more vulnerable to predation under high salinity conditions. The actual effect of the project on salinity and nutrient levels was disputed, however.
 
 
 29
 The Sierra Club's witnesses testified to several deficiencies they perceived in the EIS-PACR's treatment of salinity and nutrient conditions following construction of the project. First, several of the Sierra Club's witnesses hypothesized that reduced freshwater flow caused by construction of the reservoir would result in severe increases in salinity levels in the delta marshes, with a concomitant reduction in some forms of marine life. These witnesses were concerned that this area might become open water habitat, and no longer hospitable to certain developing organisms (e.g. shrimps) that sought lower salinity level water for protection from predators. The Sierra Club's experts did not conduct a study on this question, however; their opinions were based solely on educated speculation. The Corps, on the other hand, thoroughly examined this question, and in fact reached conclusions similar to, though not as severe as, the Sierra Club's experts. The Corps expected few salinity changes in the marsh in the early years of operation because freshwater flow would not immediately be reduced; but as demand for water increased over time, the Corps believed that the marsh could be expected to change from primarily freshwater marsh to primarily brackish marsh. At most, the dispute over the degree of salinity change in the delta marsh amounts to a scientific disagreement among experts. Such disagreements are not the type that the federal courts are in business to resolve. South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1014 (5th Cir.1980). "[A] divergence of viewpoints among experts ... does not render an impact statement inadequate." Id.; see also Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir.), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973).
 
 
 30
 The Sierra Club also faults the Corps for its treatment of the effect of the project on the nutrient flow to the estuary below the project. But the Sierra Club's objections to the Corps' examination of nutrient flow only amount to disagreement over the method employed to study this matter when more than one acceptable method was available. The Corps fully considered nutrient flow in the EIS-PACR, and concluded that the reservoir would only minimally lessen this flow. Academic disagreements over proper methodology are not enough to condemn an otherwise adequate EIS.
 
 
 31
 Finally, the Sierra Club claims that the EIS-PACR was deficient for failing to conduct any mathematical modeling whatsoever on the project's effect on Galveston Bay's salinity level. The Corps admits that no such modeling was done, but argues that it was not needed. According to the Corps, the modeling conducted on the delta marshes showed such small increases due to the project that a salinity study of the Bay would have been a waste of time and money. The Sierra Club's witnesses insisted, however, that such modeling was possible, and should have been done. But not every conceivable scientific technique available must be employed when examining the environmental impacts of a proposed project. Such a requirement would create exactly the kind of nit-picking courts should avoid. The relevant inquiry is whether the agency has taken a good faith "hard look" at the environmental consequences of the proposal. We hold, as a matter of law, that the Corps' final EIS satisfies this test.
 
 IV
 Congressional Authorization of Wallisville
 
 32
 The final issue presented by this appeal concerns whether Congress must authorize the Wallisville project before construction resumes. In 1983, Congress passed Pub.L. No. 98-63, entitled "Supplemental Appropriations Act, 1983," which states:
 
 
 33
 The Wallisville Reservoir, Texas, project, authorized by section 101 of the River and Harbor Act of 1962 (Public Law 87-874), is hereby modified with respect to its physical elements and planned operation as recommended in the Wallisville Lake, Texas, Post-Authorization Change Report, July 1981, as supplemented, July, 1982.
 
 
 34
 This authorization, referencing both the EIS-PACR and the SIPACR, was passed prior to final NEPA processing, and indeed before the SIPACR was in the public domain.
 
 
 35
 The district court disapproved of Congress' 1983 action, finding that although the Act constituted "actual authorization" of the project, "Congress has declined in this instance to abide by its own legislation." Wallisville II, 630 F.Supp. at 1220. The district court found the authorization to be "fatally flawed by being based on the incomplete NEPA documents (EIS-PACR and SIPACR)," and refused to "condone" such action. Id. at 1233. The court therefore refused to sanction the 1983 legislation, stating that any validation "will have to come from a higher court." Id. at 1220.
 
 
 36
 We note, initially, that courts cannot set aside legislation because it is inconsistent with prior legislation. Manigault v. Springs, 199 U.S. 473, 487, 26 S.Ct. 127, 133, 50 L.Ed. 274 (1905); see generally United States v. Will, 449 U.S. 200, 221-22, 101 S.Ct. 471, 484, 66 L.Ed.2d 392 (1980). Congress may repeal, amend or ignore any statute it has enacted. Manigault, 199 U.S. at 487, 26 S.Ct. at 133. Indeed, as the district court itself recognized, Congress may exempt a given project from NEPA's procedural requirements. Wallisville II, 630 F.Supp. at 1225; see Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 355 (8th Cir.1972). The difficulty in this case appears to arise from Congress' "authorization" of the project on the basis of data that had not been refined through the entire NEPA process, without also exempting the project from further NEPA review.
 
 
 37
 Congress' power to exempt, and its power to authorize, however, are quite distinct, and should not be confused. When Congress exempts a project from NEPA, no agency approval is subsequently required. Authorization, on the other hand, sanctions a project that otherwise receives independent approval from the agency. But Congress need not wait for the agency to approve construction of the project before passing an authorization bill. See, e.g., Committee for Nuclear Responsibility, Inc. v. Seaborg, 463 F.2d 783, 785 (D.C.Cir.1971). Indeed, as in the present case, Congress may use this lever to prompt the agency out of its lethargy; if this lever is used, absent explicit exemption from NEPA, the agency must still complete an independent good faith hard look at the environmental consequences of the project.[5] Finally, if Congress authorizes a project prior to an agency's completed review, there is no need for it to reauthorize the project after the agency completes its review. If Congress becomes unsatisfied with the project following agency approval, it, of course, has the power to rescind its authorization.[6] See Prairie Band of Pottawatomie Tribe v. United States, 564 F.2d 38, 47 (Ct.Cl.1977). And in the final analysis, the courts are available to ensure that the agency has complied with NEPA's procedural requirements.
 
 
 38
 Having reached our final analysis, we hold that the Corps has fully complied with the procedural requisites of NEPA, and Congress has approved construction of the Wallisville project.
 
 
 39
 The judgment of the district court is REVERSED and the injunction is VACATED. The case is DISMISSED.
 
 
 
 [1]
 The parties agree that the 1983 authorizing legislation did not exempt the Wallisville project from NEPA
 
 
 [2]
 The regulations of the Council on Environmental Quality (CEQ) dictate that agencies
 (1) Shall prepare supplements to either draft or final environmental impact statements if:
 (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
 (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.
 (2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.
 
 
 [40]
 C.F.R. Sec. 1502.9(c). See Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) ("CEQ's interpretation of NEPA is entitled to substantial deference.")
 
 
 [3]
 An obvious difference between York and the present case is that the without project assumption change in York posed potentially adverse consequences, whereas here the alleged change makes the project more attractive. This difference is not relevant, however, since NEPA is concerned with accurate and informed decisionmaking as a general matter. An environmental report that erroneously depicts positive environmental consequences poses as significant an obstacle to informed decisionmaking as one that inadequately assesses adverse circumstances. See Environmental Defense Fund v. Marsh, 651 F.2d 983, 993 (5th Cir.1981) ("NEPA is concerned with all significant environmental effects, not merely adverse ones.")
 
 
 [4]
 Indeed, we note that even though the district judge did not make any factual findings on the substantive adequacy of the EIS-PACR, he stated at the completion of the Sierra Club's case-in-chief that he shared "some of the concerns that were expressed" by the Corps' counsel, and, by his comments, seemed unconvinced that the Sierra Club had been able to "satisfy the burden" of proof it bore
 
 
 [5]
 The Sierra Club argues that the Corps did not complete NEPA's processing requirements, because BERH did not issue a report on the EIS-PACR. Citing no case authority, the Sierra Club relies on the Corps' regulations requiring BERH review for "survey studies." 33 C.F.R. Part 230, App. C, Sec. 1.d. (1986). This regulation, however, is not applicable to reports, such as the EIS-PACR, prepared in the latter stages of project development. We find no provision in NEPA, or in the regulations, requiring BERH review for an authorized project. Compare 33 C.F.R. Part 230, App. C, Sec. 1.d. (1986) with 33 C.F.R. Part 230, App. C, Secs. 2-4 (1986)
 
 
 [6]
 In fact, rather than voicing concern over the Corps' NEPA review, Congress has been quite vocal about getting construction going again. Following the 1983 authorization, Congress has twice made its wishes clear regarding Wallisville. As noted above, both the House and Senate Reports to the Energy and Water Development Appropriation Act of 1985, Pub.L. No. 99-141, 9 Stat. 564, "urge[d] the earliest possible completion of the project." H.R.Rep. No. 195, 99th Cong. 1st Sess. 37 (1985); S.R.Rep. No. 110, 99th Cong., 1st Sess. 41 (1985). And in 1986, the House Report accompanying an appropriations bill for fiscal year 1987 responded to the district court's refusal to lift the injunction as follows:
 The Committee notes that Congressional reauthorization of this project in the FY 1983 Supplemental Appropriations Bill has been held by a U.S. District Court to be "fatally flawed" because it was not "a well informed decision." This holding is being appealed and the Committee is confident that this display of judicial interference will be struck down. Therefore, the Committee has included $100,000 for resumption of construction of this much needed and long overdue project as soon as the district court's injunction is lifted.
 H.R.Rep. No. 670, 99th Cong., 2d Sess. 33 (1986).