**SIERRA CLUB et al.**

v.

**Rogers C. B. MORTON et al.**

**Civ. A. No. 73–V–3.**

United States District Court,
S. D. Texas,
Victoria Division.

Oct. 3, 1975.

1. *The Philadelphia Inquirer,* Thursday, November 30, 1972.

Richard A. Shannon, Austin, Tex., for plaintiffs.

W. Palmer Kelly, Asst. U.S. Atty., Houston, Tex., for defendants.

## MEMORANDUM

OWEN D. COX, District Judge.

The Plaintiffs, on March 15, 1973, filed their complaint for injunctive and declara-

tory relief against the Defendants herein, Rogers C. B. Morton, Secretary of the Department of Interior of the United States of America; Gilbert Stamm, Commissioner of the Bureau; James A. Bradley, Regional Director of the Bureau of Reclamation, officing in Amarillo, Texas; and Norman Flagg, Area Planning Officer of the Bureau of Reclamation, Defendants. They allege the Defendants are acting unlawfully and without authority in their prosecution of the Palmetto Bend Project (called sometimes Palmetto Bend), and they seek to enjoin further development of it.

Plaintiff Sierra Club is a non-profit corporation organized and existing under the laws of the State of California· it is a national conservation organization having approximately 140,000 members, of whom several thousand are residents of the State of Texas. Plaintiff Palmetto Citizens Group claims to be a private, voluntary, unincorporated citizens' association whose members are citizens, residents, and, in some instances, landowners in the area to be affected by the Project. One of the affected landowners, Wayne L. Legro, is also a named Plaintiff. These environmental protection activists contend the government officials and agencies just named have not complied with applicable laws, regulations, executive orders and agencies' policies. On September 30, 1974, this cause came for trial before the Court without a jury, and continued intermittently through November 14, 1974.

## BACKGROUND INFORMATION

Public Law 90–562, 43 U.S.C., §§ 616gggg, et seq., by which the Congress of the United States determined the need for this project, was approved by the President on October 12, 1968. It authorized the construction of that portion of the Project which has been designated Stage One, and about which we are here primarily involved.

It further authorizes the purchase of lands involved in Stage Two.

Testimony and exhibits presented reflect that as early as 1957 area residents contacted the Bureau of Reclamation in regard to the possible development of adequate surface water supplies. In 1967, the voters of Jackson County authorized the Lavaca-Navidad River Authority (L–N RA) to issue bonds in the amount of $3,770,000, to meet the Authority's financial obligations incurred in construction of the Palmetto Bend Dam.

Stage One of the Project [1] will be an earth-filled dam with concrete spillway, multiple-level river outlet works, and dual-level outlet works for allowing municipal and industrial water releases. The 7.9-mile dam structure will be located on the Navidad River in Jackson County, Texas, near the two small cities of Edna and Ganado, and approximately four miles above the confluence of the Lavaca and Navidad Rivers. The Navidad River drains an area approximately 1,400 square miles above the dam site. Historically, the flows of this river have been very erratic.

The reservoir will extend approximately eighteen miles up the two principal tributaries, Sandy and Mustang Creeks. At the normal water surface elevation (also called the conservation pool level) of 44 feet above mean sea level, the reservoir will have approximately 125 miles of shorelines, will contain approximately 170,300 acre-feet, and have a surface area of approximately 11,000 acres, and when the water level reaches the maximum available, that is, 47 feet above mean sea level, the reservoir will contain 204,300 acre-feet and have a surface area of approximately 12,500 acres· subject to the estimated annual sedimentation rate of 215 acre-feet. The Project is to provide water for municipal and industrial purposes (an expected firm water yield of 75,000 acre-feet annually), as well as recreational, fish, and wildlife facilities. Congress has appropriated funds for the continued con-

1. The following, as well as a more detailed, description of Stage One is contained in the Final Environmental Impact Statement (FEIS),

Plaintiffs' and Defendants' Exhibit 3, at A–8 through A–25.

struction of Stage One every year[2] since the first appropriation in 1968, by Public Law 90–562, 43 U.S.C., §§ 616gggg *et seq.*

■ There has been some consideration given to the possibility of constructing a Stage Two dam and reservoir[3] over Post Oak Creek and the Lavaca River. This would tie into the Stage One dam and reservoir. However, the Congress has acted regarding Stage Two only to the extent of authorizing land acquisition. Should the Secretary of the Interior issue a feasibility report concerning Stage Two, a complete environmental impact statement is to be made prior to initiation of actions seeking authorization for the construction of Stage Two. If Stage Two is not activated, Stage One can stand alone. Therefore, there is no reason for the Court to consider Stage Two at this time. *Sierra Club et al. v. Callaway, Secretary of the Army,* 499 F.2d 982 (5th Cir. 1974).

In 1949, investigations were begun by the Bureau of Reclamation to study water supply problems of the Texas river basins draining into the Gulf of Mexico. This was commonly referred to as the Texas Basins Project. Various studies culminated with the publishing of the Texas Basins Project report in February, 1965. The key element to part of the Texas Basins Project would be an Interbasin Canal extending a total length of 418 miles, from the Sabine River near Orange to its terminus near Raymondville in the Lower Rio Grande Valley. The canal would facilitate inter-basin transfer of water supplies from river basins having excess supplies to other areas to fulfill the needs of municipal and industrial, as well as irrigation, projects. At points where the proposed canal intersects a river, it would become necessary to either siphon the water under the river or else utilize a surface reservoir into which the incoming water is stored temporarily, then equalized in level and transported further along the canal.

■ Clearly, Palmetto Bend constitutes an integral part in the plans for the Texas Basins Project, since the Palmetto Bend reservoir would be utilized to transmit water across the Navidad River along the Interbasin Canal. Despite the possible integration of Palmetto Bend and the Texas Basins Project, if the latter is ever completed, Palmetto Bend has been authorized and dealt with as a separate entity and there is no justifiable reason to treat it otherwise; it will be examined accordingly. *Sierra Club v. Callaway, supra.*

The Texas Water Plan addresses the issues of management, development and redistribution of the state's water resources, as well as the possibility of importation of water from out of state. While the Texas Water Plan anticipates the future construction of the Texas Basins Project, the fact remains that the Plan is an inventory of existing and potential water sources, binding in no way upon the federal government.

On the 2nd day of February, 1972, the United States of America, acting through the Regional Director of the Bureau of Reclamation, entered into a written contract with the Texas Water Development Board and the Lavaca-Navidad River Authority, whereby the state contracting agencies agreed to repay certain portions of the costs of constructions and the costs of maintenance and operation of the dam and reservoir.[4] All of the water for municipal and industrial purposes to be produced by the reservoir (a firm yield of 75,000 acre-feet per year) is to be used or held by the state agencies after obtaining permits for such use from the Texas Water Rights Commission, which Commission must pass upon each of the areas of allocation.

**2.** Public Law 91–144, December 11, 1969, 83 Stat. 323, $200,000. Public Law 91–439, October 7, 1970, 84 Stat. 890, $1,000,000. Public Law 92–134, October 5, 1971, 85 Stat. 365, $1,775,000. Public Law 92–405, August 25, 1972, 86 Stat. 621, $7,300,000. Public Law 93–97, August 16, 1973, 87 Stat. 318, $6,990,- 000. Public Law 94–393, August 28, 1974, 88 Stat. 782, $9,349,000.

**3.** See FEIS, at A–25; Defendants' Exhibit 15, Item R–5, House Document No. 279 at 25–29.

**4.** Defendant's Exhibit No. 15, Item R–23.

**16**

## PROCEDURES UNDER NEPA

■ The Congress, in enacting the legislation entitled "National Environmental Policy Act of 1969," effective January 1, 1970, and referred to as NEPA, has authorized and directed all agencies in the federal government to include in "every recommendation or report on proposals for . . major Federal actions significantly affecting the quality of the human environment, a detailed statement", which is commonly referred to as an Environmental Impact Statement. So, the Bureau of Reclamation, pursuant to the provisions of Sec. 102(2)(C) of NEPA [42 U.S.C., § 4332(2)(C)], prepared a final environmental impact statement, describing this Palmetto Bend Project, which was filed with the Council on Environmental Quality (CEQ) on May 19, 1972. The text of the statement, exclusive of index and comments, consisted of 28 pages. Although this project has had congressional approval since 1968, NEPA is applicable. It is recognized that this legislation is effective as to ongoing projects, and the extent to which a project has been completed is a factor to be carefully weighed in considering the equities. *Sierra Club et al. v. Callaway, supra,* p. 993. Here, while land had been purchased and cleared and some roads and railroad tracks relocated, no construction has been commenced.

■ However, in response to the initiation of this lawsuit by the Plaintiffs, the Defendants prepared a new draft of an environmental impact statement, designated DES 74–50, which was filed with the CEQ on May 1, 1974. The current final environmental impact statement, designated FES 74–54, was filed with the CEQ on September 13, 1974. The text, exclusive of the consultation and coordination section and the appendix, is 142 pages in length. The Bureau of Reclamation considers it to be a very complete environmental statement, but the Sierra Club is not at all happy with it. In resolving this conflict, we have to understand this is a relatively new field of the law and that there is no clearcut rule as to how full and complete such a statement must be. Nevertheless, we do know it need not be perfect. However, such a statement should be sufficient to enable those who did not participate in compiling the statement to understand the factors involved and fully consider the significance of such factors. *National Helium Corporation v. Morton,* 486 F.2d 995 (10th Cir. 1973); *Trout Unlimited v. Morton,* 509 F.2d 1276 (9th Cir. 1974). It need not discuss remote and highly speculative consequences. *EDF v. Corps of Engineers,* 348 F.Supp. 916, 933 (N.D.Miss.1972), aff'd, 492 F.2d 1123 (5th Cir. 1974).

Plaintiffs' unhappy attitude is predicated upon their general contention that there is a failure of such final environmental impact statement to comply with the requirements, both substantive and procedural, of NEPA. They say the FEIS fails to present sufficient information to alert the public and the decision-makers to the known possible environmental consequences of the Project, and to the likelihood and severity of such consequences. Additional charges include alleged inconsistencies throughout the text; summary statements that are overly conclusive and are not supported by adequate reference to relevant literature and studies; and the failure to present fairly opposing views of the public and various agencies.

The Defendants contradict Plaintiffs by saying that the FEIS presents "base-line" data and references in such detail that a layman without expertise in the field would have no difficulty in comprehending the discussion and analysis.

■ Numerous citations to authorities appear throughout the text, although the responses made to comments received fail to include such documentation. The Court finds the text to be supported by adequate references to authorities, despite the ability of the Plaintiffs at trial to obtain admissions from some witnesses that certain references that had not been included would have been relevant.

The adequacy of the textural information presented will be addressed in the consideration of the different subject matters, while the issue of presenting opposing views will

be encompassed in the discussion of consultation and coordination.

## ALTERNATIVES TO PROJECT

■ According to the Plaintiffs, the FEIS fails to present alternatives to the Project so as to enable an intelligent assessment of the true costs of the Project. Further, the reasonableness of some alternatives is said to be presented in a biased manner; i. e., the ground water alternative unjustifiably assumes a cost to deliver ground water to the dam site instead of comparing the delivery costs of ground water with the delivery costs of water from the proposed reservoir. As it appears to the Court, it is not necessary to have first pointed out all of the other impacts the Project may have on the environment before discussing the alternatives. So, this is as good a point as any to decide if the Bureau has adequately shown what other avenues there are of obtaining approximately the same amount and quality of water as the Palmetto Bend Project will make available.

The Bureau's main discussion of alternatives occurs in Section H of the FEIS, supplemented by Section F of the Appendix. The alternatives, based on appraisal-grade estimates,[5] are other nearby reservoir sites, ground water, deep geothermal ground water, desalinization of sea water, importation, management of existing supplies and nondevelopment.

The Court is of the opinion that, with the exception of nondevelopment, the statement adequately describes the alternatives considered and demonstrates that none of them could provide 75,000-acre feet of water on an annual basis at a lower economic and environmental cost. It is not necessary that these facts be verified by extensive testing, nor does the Bureau have to justify the hypothesis set forth.

Of the above alternatives, the most likely appears to be the development of ground water. To do this, FEIS points out a system with 67 wells each producing 1 million gallons/day, joined by a connecting system 110 miles long, would be required. The statement explains that the major drawback of such alternative, from economic and environmental angles, would be the necessity of obtaining water rights to approximately 238,000 acres of land. Further development of ground water would increase the problems of salt-water encroachment and land subsidence, although it does appear that subsidence in the immediate Project area would be uniform. In its efforts to compare the costs of water obtained from the Project to that of ground water, the Bureau of Reclamation was unable to place the probable locale of future users of the water. This resulted in the questionable assumption (for comparison's sake) that the water from all of the wells would be delivered to the same place—the Project site.

While the environmental costs of geothermal production (water from great depths) might be less than those attributed to the Project, the present feasibility of such production has not been established.[6] Although the Sierra Club takes issue with the Bureau because the FEIS does not consider the alternative of delay pending completion of all studies which relate to the possible environmental impacts of the Project, this can only be classified as a stalling complaint and has no real merit. The Court concludes that the Defendants have presented, in sufficient detail, the viable alternatives to the Project.

## RIVERINE AND ESTUARINE SYSTEMS

■ Plaintiffs complain there is inadequate explanation regarding the impact of the Palmetto Bend Project on the Navidad

---

5. "An appraisal-grade estimate is a brief investigation of a project to determine whether it appears feasible for more detailed study." Response to Comments by Plaintiff Sierra Club, at 61.

6. FEIS, at H, § 3a.2; Comments by Finn of the Geothermal Energy Institute.

River below the dam and the changes in the Lavaca River downstream from the Navidad River into the Lavaca-Matagorda Bay estuaries system and its associated biotic communities. They challenge the sufficiency of the steps proposed by the Bureau to protect said estuaries system. Section C of the FEIS contains the general discussion of expected environmental impacts, while the impacts upon the estuarine complexes are further detailed in Sections E and I of the Appendix.

The Plaintiffs expressed concern about stratification (thermal, chemical or nutrient) occurring in the reservoir, and argues the government had not satisfactorily explained how it would be handled. Various problems have been recognized by the Bureau of Reclamation and it has provided, in order to protect and guard the quality of the water released, and to maintain the Lavaca-Matagorda Bay estuarine system and its associated biotic communities, a multiple-level outlet works designed to permit the release of water from the reservoir at different levels for water-quality control and estuary management. This outlet works would also offset stratification. One expert witness, Dr. Hubbs, believed that the lower sill of the lowest outlet was not sufficiently low to be of use in offsetting stratification. The reason for the design, as explained by Mr. Beuttner, was the Bureau of Reclamation's belief that the particular sill could be placed no lower because of expected sedimentation in the reservoir. The presentation of expected sediment entrapment in the reservoir was said to be based on the best information available. The explanation in the FEIS is more than adequate, although there may be some disagreement as to the particular levels at which said outlet works should be placed.

The FEIS also explains the adverse impact which will be caused by a slight overall reduction in the flow of sediment and nutrients to Lavaca and Matagorda Bay. The

reduction of fresh water inflow into the estuarine system as a result of the reservoir appears to be well documented and should fall within the natural parameters of the existing ecosystems. However, concern has been expressed regarding the Defendants' failure to provide for the long-term release of reservoir water to the bay-estuarine complex during low flood periods. Dr. Oppenheimer stated his belief that any changes in the fresh water inflow to the bay as a result of the Project would not reduce the productivity, although the variance in the salinity could lead to the predominance of different types of fish. Defendants state that ongoing studies are attempting to ascertain the need for the downstream releases, and that the program finally adopted may include a specified minimum release rate.[7] Should a minimum release rate be deemed necessary, the Texas Water Rights Commission (TWRC) has reserved the right to direct the release of water to maintain the bay-estuarine system.[8]

The government is certainly aware that water quality must be maintained at a high level in a project such as we are concerned with here. The FEIS sets forth the water quality standards for Lavaca and Navidad rivers which were adopted by the Texas Water Quality Board, submitted to EPA and approved October 25, 1973. Provisions are made therein for the periodic review (at least once each three years) of water quality standards. But, Plaintiffs take a dim view of the possibility of maintaining high quality water in the Palmetto Bend Reservoir. They contend that upon construction of the Project the Defendants will, to a scientific probability amounting to a certainty, violate the Federal Water Pollution Control Act Amendments of 1972.[9] The Court thinks this must be an exaggeration. Be that as it may, this matter has been fully covered in the FEIS. To effectuate the Act's intent, the Environmental Protection Agency promulgated Guidelines for

7. Response to comment by EPA.

8. At App. "G"; explanation at FEIS at A-19-20.

9. Public Law 92-500; 86 Stat. 816; 33 U.S.C., § 1251, et seq.

Developing or Reviewing Water Quality Standards.[10]

Through the utilization of a routing study performed by the Texas Water Development Board (TWDB), Defendants predict that the water impounded by the reservoir, and the water released downstream, will meet current state water quality standards, as well as the recommended maximum limits for public water supplies set by the Federal Water Pollution Control Administration. The comment filed by the EPA indicates that agency's belief that the reservoir should be an acceptable source of domestic water supply. There seems no reason to begrudge the government's approach to water quality.

The Court is satisfied the analysis of the various impacts which will result from the construction of the Project to the environment, such as vegetation, water quality, stratification (thermal, chemical or nutrient), landscape alteration, and the impacts which will result to the riverine and estuarine system during the operation and maintenance of the Project is fully explored in the statement. The fact that there is a difference of scientific opinion among experts, as was the case on the trial of this case, does not mean the problem has not been adequately discussed in the FEIS; nor does such difference mean the explanations must be discarded.

Diverse expert testimony was adduced concerning the probable impacts of the Project on the amount of nutrients that would be transported into the bays. On this matter, Dr. Davis found the presentation in the FEIS to be thorough, and expressed his opinion that from a nutrient standpoint, the reservoir would not be harmful to the bay.

## WILDLIFE AND FISH

▮ That portion of the Navidad River Basin to be inundated by the dam and reservoir was, at the beginning of this Project, mostly privately-owned land. The lands bordering the river in the reservoir site area are hardwood bottoms which merge quickly with flat coastal prairies used primarily for pastures and farming. Vegetation in the reservoir area consists of elm, ash, species of oak, live oak, cottonwood, pecan, hickory, bay and mulberry. Native grasses in the coastal prairie areas include bluestem, Indiangrass, eastern gama grass, gulf prickly and species of Panicum. Man's impact (erosion, overgrazing, etc.), in making a living over the years, has brought in invader plants such as prickly pear, broomsedge, mesquite, palmetto, greenbrier, and hawthorn rose hedge. A considerable portion of the reservoir area will be cleared. The FEIS discusses the acreage intended to be cleared, and both the beneficial impacts as well as the adverse impacts.

At the trial, Plaintiffs produced two witnesses, Sheffield and Carlisle, who were employed at the time by the Texas Parks and Wildlife Department (TPWD). The scope of their testimony focused on the clearing plan [11] adopted by the Defendants and the clearing plan [12] advocated by the TPWD. The obvious attempt to justify the appearance of these witnesses and to make them disinterested by the use of subpoenaes served after they had already arrived in Victoria from Austin, Texas, makes their testimony suspect as to impartiality.

The Court finds that the clearing plan adopted represents a compromise between total clearing, usually advocated by the Bureau of Reclamation, and requested by the Environmental Protection Agency, and minimal clearing, sought by the TPWD and the Fish and Wildlife Service. The proposed clearing plan attempted to harmonize a number of competing interests, including water quality, safety of the dam and spillway, public safety, backwater effect, and the requests by residents in the Ganado area. It was the work product of corre-

10. Defendant's Exhibit 76.

11. See diagram following A–14 and discussion at A–13 through 14, and C–8 through 10.

12. See Plate 3 following H–13 and discussion on H–13; see also proposed plan by F & W Service at Plate 2, App. "B".

spondence, meetings[13] and comments and responses. The effect of the plan can be easily assessed from the information in the FEIS.[14]

Wildlife game species in the area include white-tailed deer, squirrels (gray and fox), quail, dove, rabbits and raccoons. Long-term impacts on wildlife species will result from the permanent loss or alteration of their habitat. The inundation will eliminate some excellent white-tailed deer hunting. The American alligator, a threatened species, is found within the stream and marshes of the Project area, although the majority are believed to inhabit the tidal area downstream from the reservoir site. Nesting areas will be adversely affected and some beds will be displaced. The explanation as to what will happen to wildlife in the general area is sufficient.

A survey of the Navidad River by the Texas Parks and Wildlife Department (TPWD) collected 59 species of fish. Desirable species discovered included various types of catfish, sawfish, bass and crappie, although the majority of the fish accounted for, in terms of number and weight, were forage fish.

Plaintiffs challenge the sufficiency of the coordination between the Defendants and relevant agencies, as called for by the Fish and Wildlife Coordination Act.[15] An examination of the FEIS and Appendix reveals Defendants' compliance with the Act. The testimony and exhibits at the trial did not refute this.

Project coordination between the Defendants and the United States Fish and Wildlife Service, formerly the Bureau of Sports Fisheries, dates back to October 23, 1962. In a report dated September 24, 1971, the Fish and Wildlife Service made eight recommendations for mitigation of the project's adverse impacts, which were adopted by the Defendants. Comments by the Service are presented in the FEIS, along with the Defendants' responses thereto. The Court finds that mitigation measures as to various forms of wildlife which have been adopted by the Defendants in good faith, and adequately explained, have not been proved inadequate by the Plaintiffs.

### ARCHEOLOGICAL–HISTORICAL

■ Plaintiffs believe that the Defendants are, at present, and will be in the future, in violation of the provisions of Public Law 86–523,[16] which call for the preservation of historical and archeological data which might be destroyed by construction of the project.

Testimony by the Acting Director of the Texas Archeological Survey, Dave Dibbell, revealed that the recovery of archeological data has been completed at seven of the nine sites located in the project area.[17] Completion of studies at the two sites will, in Dibbell's opinion, exhaust the recovery work on the project. The data gathered has not called for the utilization of any preservation techniques.

Alton Briggs, an architect with the Texas Historical Commission, participated in the inventory of the archeological data, and in the preparation of the Archeological Survey Report for the project. Briggs stated that, to date, no sites which would be affected by the project are eligible for inclusion in the National Register of Historical Sites, and that there is no reasonable probability that any eligible sites will be discovered. But, the Bureau has agreed, by its response to comment by the Texas Historical Commission, that if such a discovery be made during construction, work would be stopped in order to allow the necessary salvage to proceed.

13. I. e., at Edna, on April 25, 1973.

14. Other agencies accepting the clearing plan include: National Park Service, L–N RA, TWDB, Jackson Soil and Water Conservation District, City of Ganado, Soil Conservation Service. (FEIS, at A–14.)

15. 48 Stat. 401, as amended, 16 U.S.C., § 661, et seq.

16. 74 Stat. 220; 16 U.S.C., § 469, et seq., as amended, Public Law 93–291; 88 Stat. 174.

17. Recovery work funding jointly by Nat. Parks Services and University of Texas.

## RECREATION

█ Plaintiffs attempted to show the absence of need for additional surface water acreage in the project area for recreational purposes. However, the FEIS does have a development plan in sufficient detail so as to be rather easily understood, and it has also explained the problems that go along with the proper management of such a large recreational area. The testimony of one of Plaintiffs' witnesses, who relied on studies for the Texas Outdoor Recreation Plan, attacked the FEIS by his testimony that the existing water surface acreage was sufficient for the surrounding eleven-county area. Farquhar, who supported the Bureau's position, stated that the only two lakes in the immediate vicinity, Eagle Lake and Lake Smithers, were privately owned with limited accessibility by the public. The available information, within the FEIS, points to the need for the additional surface water this reservoir will afford. This latter discrepancy is not sufficient to repudiate the discussion on recreation.

## BENEFIT–COST RATIO

█ The primary purpose of Palmetto Bend is to provide 75,000 acre-feet annually to meet the municipal and industrial water demands in the Jackson-Calhoun County area. The Plaintiffs argue that the Final Environmental Impact Statement is inadequate because it fails to provide information and analysis which establish a local need for such additional water. Although there has been some decrease in population in such area and there does not appear to be a current demand for the additional water, testimony reflects the existence of an anticipated demand. In view of the time lag attendant upon the implementation of such a project,[18] construction must precede demand. This is common sense.

The Plaintiffs, by their complaint that no detailed cost-benefits ratio has been calculated, are apt to leave the impression that no one has really given any thought to that matter. However, the information available to those who reviewed the FEIS with reasonable care showed that as early as December, 1962, a plan of development of Palmetto Bend Project, Texas, was published, and subsequently, in October, 1963, a further report was published. In each one of these reports, the benefits-cost ratio was considered. Then, in 1965, a report on the Palmetto Bend Project was presented to the President and the Congress. This latter feasibility report,[19] as well as the Definite Plan Report, was prepared in accordance with Senate Document No. 97, which contains Policies, Standards, and Procedures in the Formulation, Evaluation, and Review of Plans for Use and Development of Water and Related Land Resources. Senate Document No. 97 was superseded on October 25, 1973, by the Water Resources Council's Principles and Standards for Planning Water and Related Land Resources.[20] The latter standards, by their provision, are to be applied only to projects authorized after their effective date.

But, getting back to Plaintiffs' contention that a major fault of the FEIS is its lack of a detailed discussion of the project's benefit-cost ratio, we conclude the FEIS is, in all other respects, sufficiently clear and comprehensive, so that there is no real reason for a mathematical decision as to such ratio.

In the case of *Trout Unlimited et al. v. Morton, Secretary of Interior,* 509 F.2d 1276, 1286 (9th Cir. 1974), the Court, in dealing with a problem similar to ours, said:

"Notwithstanding this evaluation of reasonably related alternatives and the conclusion of the EIS that the project's benefits exceed its costs, the appellants insist that the EIS is inadequate because it does not contain a formal and mathematically expressed cost-benefit analysis. We do not believe such an analysis is

---

18. I. e., estimated time of construction, 3 to 3½ years.

19. House Document 279, Defendant's Exhibit 15, Item R–8.

20. Federal Register, Vol. 38, No. 174.

necessary to enable an EIS to serve the purposes for which it is designed.

"This conclusion rests upon the hard fact that there is sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity. It follows that in most, if not all, projects, the ultimate decision to proceed with the projects, whether made by Congress or an agency, is not strictly a mathematical determination. Public affairs defy the control that precise quantification of its issues would impose."

In *Sierra Club et al. v. Roger C. B. Morton et al.*, 510 F.2d 813 (5th Cir. 1975), the Court was concerned with the sale by the Department of Interior of oil and gas leases in the eastern Gulf of Mexico. After stating, on page 819, that the Court's task is "to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors", it then pointed out, on page 827, that the question the "appeal urges is how specifically must this relationship be quantified, i. e., must a dollar and cent weighing of the costs and benefits of the proposed sale be set out in the EIS". In resolving the question, the Court quoted *Sierra Club v. Lynn*, 502 F.2d 43, 61 (5th Cir. 1974), as saying, "NEPA does not demand that every federal decision be verified by reduction to mathematical absolutes for insertion into a precise formula." And then went on to say that the statement,

". . . by giving the decisionmaker and other readers enough detail concerning all of these costs and benefits to permit reasoned evaluation and decision, meets the Section 102(2)(C)(iv)[21] requirement that *long-term* environmental costs be weighed against *immediate benefits*." (Emphasis ours.)

We realize that, in projects not primarily related to municipal and industrial use, such ratio is required by some courts. The above-cited cases are in point and the language quoted is applicable here. Plaintiffs have failed to show the necessity for inclusion of said ratios in the Final Environmental Impact Statement.

Since we have not required a detailed cost-benefit ratio discussion in the FEIS, there is no need for a substantive review to decide if the project is worth the cost. Nevertheless, there was presented by the government on the trial of this case a satisfactory ratio of benefits to cost. In an attempt to compare the expected benefits to the economic costs, the Bureau of Reclamation projected benefits derived from the use of municipal and industrial water supplies, recreation visitation, fishing and hunting visitation, and highway improvement. Dollar values were not ascribed to environmental costs, pursuant to the then existing standards of Senate Document No. 97. Unable to reliably ascertain the market value of the water to be supplied for municipal and industrial uses, the Bureau approximated the cost of achieving the same result by what it considered to be the most likely alternative: a single-purpose reservoir located at the Project site, privately financed over a 30-year period at an interest rate of six percent. The economic benefit-cost ratio was placed at 2.45:1 in April, 1972; for July, 1974, Defendants' economist fixed it at 2.4:1.[22] Two of the Defendants' witnesses testified that every municipal and industrial water-works project would have a benefit-cost ratio of at least 1:1, assuming that the interest calculations contained in Senate Document No. 97 are adhered to.

■ It is true that it is presently hard to tell how long it will take for the reservoir to fill, how long before it produces revenue, and how profitable its operations

---

21. 42 U.S.C., § 4332(2)(C)(iv).

22. See also response to comments by Texas Water Rights Commission's letter of June 6, 1974: "It is not the policy of the Bureau of Reclamation and the Department of Interior to include comprehensive project capital cost data in an environmental impact statement. However, the benefit/cost ratio of the Palmetto Bend Dam and Reservoir Project as of July, 1974, was 2.4:1."

will be. And, here we believe it should be mentioned that the Bureau of Reclamation's instructions for drafting environmental impact statements do not require inclusion 'of benefit-cost ratios. Evidence on the trial to the effect that a reservoir built primarily for municipal and industrial purposes will always have benefits in excess of costs. In any event, the responsibility of determining whether the United States can afford a project of this nature lies in the Congress, and, based upon its prior history, the legislative branch has already decided the dam and the reservoir of Stage One is worth the money. This was accomplished at the time the legislation authorizing the Palmetto Bend Project became law and has been the decision reaffirmed yearly as additional appropriations for the Project were made.

The length of time Dr. Jack Hopper would need to verify the government calculations as to the benefit-cost ratio was the Plaintiffs' left-handed way, or so it seemed to the Court, of getting some basis for complaint about the Court's action in over-ruling their motion for continuance at the outset of the trial. The Court extended the trial with several interim postponements, and saw no evidence that Plaintiffs were hampered in the presentation of their case.

Plaintiffs make considerable issue of the fact that serious preparation of an adequate EIS did not begin until after the commencement of this lawsuit. Plaintiffs' criticisms of the Defendants' alleged failure to utilize procedures which would insure that environmental values would be given appropriate consideration in the decision-making process [23] include the Bureau of Reclamation's failure to employ a procedure to assess the environmental impacts of water-resources projects known as the Environmental Evaluation System, prepared for it by the Battelle Columbus Laboratories,[24] and the decision not to apply the Water Resources Council's Principles and Standards for Planning Water and Related Land Resources in the preparation of the FEIS.[25]

Although the Plaintiffs' criticism of the nonutilization of the report by the Battelle Columbus Laboratories may be well taken, the Plaintiffs' criticism of the Defendants' decision to prepare a second EIS in response to this action is not. Regardless, however, the Court finds that the Plaintiffs have failed to establish that the Defendants did not employ adequate procedures to present the relevant environmental data for the consideration of the decision-makers. The Court finds that the FEIS is an amalgam of ecological information gathered by diverse sources, ranging from federal and state agencies to private individuals.[26]

A review of the bibliography, comments and responses, and analyses of the public hearings contained in the statement, in conjunction with the testimony presented at the trial, persuades the Court that the consultation/coordination between the Defendants and the participating groups and individuals was more than sufficient at both the preparatory and review stages of the statement. Notwithstanding Plaintiffs' assertion that certain of the Defendants' responses to comments are self-serving, the court finds that timely-filed comments to the project have been included in the FEIS, and that the Defendants have been successful in their good-faith effort to respond to those comments.

Plaintiffs have alleged that the Defendants determined that it was unnecessary to file a report [27] with the President whether any deficiencies or inconsistencies existed in their statutory authority to construct the project which would prohibit full compliance with NEPA, and that said determination was made before the Defendants had access to the information and comments

---

23. § 102(2)(G) NEPA; 42 U.S.C. § 4332(2)(G).

24. Testimony of Bradley.

25. Federal Register, Vol. 38, No. 174, Sept. 10, 1973, Part III; testimony O'Brien, Sweet.

26. FEIS, § CC.

27. § 103, NEPA; 42 U.S.C. § 4332(2)(G).

included in the first and second EIS's. Although testimony [28] was uncertain as to when the determination was made, one witness, Hill, stated his understanding that such a report was not required unless conditions existed which precluded compliance with NEPA. The absence of any evidence indicating deficiencies in the Defendants' authorization makes the Defendants' failure to file such a report of little consequence.

■ Plaintiffs object to the fact that the Defendants did not stop work on the Project during the drafting and review of the new EIS. The Court can find no authority (statutory or otherwise) which would require an agency to halt construction of a project which is going forward under a valid, existing EIS. Should such a requirement exist, NEPA's goal of full disclosure might be compromised in a situation where it was unclear whether a proposed change would just require a supplement to the EIS, in which case work could continue on the project, or a new EIS, which would provide more complete disclosure at the cost of a break in the project timetable.[29]

This Court has reviewed the facts which it found to exist in relation to the Palmetto Bend Project, and the conclusions it has drawn. It is satisfied that the Final Environmental Impact Statement is entirely adequate and in compliance with the requirements of the National Environmental Policy Act of 1969.

■ However, the issue as to whether or not a detailed cost-benefit ratio, which would put a dollar sign on environmental losses to be measured against the actual cost of the construction of the project, should be set forth in such Environmental Impact Statement needs a brief summary independent of the other phases of this controversy. We reiterate that the Congress initially authorized the construction of this project in 1968, or before. Thus, the situation is not as though some governmental agency or bureau is trying to cut a

project, which may seriously impair the environment, out of a large undesignated appropriation not earmarked for any particular improvement. In the case before the Court, the Congress had already determined the need, and, time after time, reaffirmed its determination by appropriating funds for Palmetto Bend. We recognize that when the need for this project became apparent to the members of the Congress, and particularly to the congressman from this district, no study was required or made concerning the varied subjects the environmentalist now consider important. However, NEPA has retroactive effect. So, there is no need to argue against the need for an environmental impact statement. And, if such statement makes it obvious there are many distasteful and disasterous environmental effects, then, perhaps, the congress needs to take another look. But, that doesn't mean that the Congress needs a cost-benefit ratio in the FEIS in order to determine how much, if any, money should be spent on the project. How much money is to be spent is for Congress to determine. Since the voters in the area which includes this site told the Congress, through their authorized representative in that body, that such project would be good for that community, there was, thereafter, no need for a cost-benefit ratio in the impact statement.

■ The Court has already made it clear that it does not intend to pass upon the substantive aspects of this project. As a general rule, when the Bureau of Reclamation publishes a final impact statement and someone attacks its validity, a court must decide if the statement gives adequate information from which the public and the Congress can determine the environmental impairment to follow. Beyond that, the Court should not go, and this Court believes the EPA does not say otherwise. If the people of the area want the project and have sold their congressman on it, and he, in turn, has obtained authorization and ap-

---

28. Testimonies of O'Brien, Hill.

29. See Defendant's Exhibit 2; Defendant's Exhibit 5, Item R–19, transmission of Bureau of

Reclamation Instructions, for a discussion of changes in EIS's.

propriations for it, what business is it of this Court or any other to step in and interfere with the orderly progress of the project's construction? This Court's duty, in this litigation, is not to sit in judgment on the Congress nor the congressman involved. Once the Court is satisfied that the information necessary to show the probable damage to the environment has been made available to the interested congressman and to the Congress and to the various agencies and interested persons, then, if the Congress still wants to proceed with the project, short of violating individual constitutional protections, the construction should be permitted to go forward. If this approach to the problem has validity, and we think it does, no detailed cost-benefit ratio was necessary in the Bureau of Reclamation's FEIS concerning this project.

This Court orders that the relief, injunctive and otherwise, prayed for by Plaintiffs, be, and such is hereby, denied. A final judgment will be signed by the Court in favor of the Defendants herein. IT IS SO ORDERED.

Copies of this memorandum shall be furnished appropriate counsel.